**Nader ASGHARI–KAMRANI and Kamran Asghari–Kamrani, Plaintiffs,**

v.

**UNITED SERVICES AUTOMOBILE ASSOCIATION, Defendant.**

**CIVIL NO. 2:15cv478**

United States District Court, E.D. Virginia, NORFOLK DIVISION.

Signed May 18, 2017

Lei Mei, Krystyna Colantoni, Mei & Mark LLP, Reece Werner Nienstadt, Irene Huei–Min Chen, Laurence Michael Sandell, Washington, DC Jeffrey Melvin Pearson, Boca Raton, FL, for Plaintiffs.

David Bruce Kuznick, Grant Thomas Rice, Matthew Carl Berntsen, Fish & Richardson, P.C., Boston, MA, Ahmed Jamal Davis, Washington, DC, David Richard Francescani, New York, NY, Michael T. Zoppo, for Defendant.

## ORDER

ROBERT G. DOUMAR, UNITED STATES DISTRICT JUDGE

This matter comes before the Court on Nader Asghari–Kamrani and Kamran Asghari–Kamrani's ("Plaintiffs") Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52(c). ECF No. 368. After considering parties' arguments, the Court ruled from the bench regarding Plaintiffs' Motion and granted the Motion on April 25, 2017. ECF No. 370. This Order serves to elaborate on some of the findings the Court made at the conclusion of the bench trial and to set forth the reasons for the ruling more fully. For the reasons stated herein and on the record at the conclusion of the bench trial on April 25, 2017, Plaintiffs' Motion is **GRANTED**. ECF No. 368.

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. PROCEDURAL BACKGROUND

Plaintiffs filed their initial complaint against United Services Automobile Association ("USAA" or "Defendant") for patent infringement on October 30, 2015, ECF No. 1, followed by a Second Amended Complaint on April 12, 2016, ECF No. 70. USAA filed a Motion to Dismiss for Failure to State a Claim on April 28, 2016. ECF No. 86.

· Of importance to the instant Motion, on April 28, 2016, USAA also filed an Answer and Counterclaims to Plaintiffs' Second Amended Complaint, ECF No. 88, asserting an affirmative defense based upon Plaintiffs' alleged inequitable conduct during and after the prosecution of the patent-in-suit and thereby seeking a declaratory judgment of unenforceability for such inequitable conduct. Specifically, the Answer contained the Third Counterclaim—litigated at the bench trial—which contended that the patent-in-suit was unenforceable for, among other issues, "failure to fully disclose known prior art" to the United States Patent and Trademark Office ("PTO"). Id. at 25. More specifically, the Third Counterclaim incorporated the Eighth Affirmative Defense, contained within the same Answer and Counterclaims, id., and which alleged that "Plaintiffs' claims for relief are barred in whole or in part by the doctrine of unclean hands or inequitable conduct," id. at 12. In support of the Third Counterclaim/Eighth Affirmative Defense, USAA alleged that Plaintiffs had made (1) false certifications to the PTO in the form of non-publication requests ("NPRs") and (2) material misrepresentations to the PTO of the priority claims of the patent-in-suit. Id. at 12–21.

On the basis of the Third Counterclaim, USAA noted it expected to seek attorney's fees and sanctions, including under 35 U.S.C. § 285. Id. at 25–26. Plaintiffs then filed a Motion to Dismiss the Counterclaims on May 16, 2016, denying all of USAA's claims of inequitable conduct. ECF No. 104.

On July 5, 2016, after finding that the claims of the patent-in-suit were invalid because they were directed to an abstract idea and thus ineligible for patent protection under 35 U.S.C. § 101, this Court granted USAA's Motion to Dismiss for Failure to State a Claim. ECF No. 140. The Court also dismissed as moot USAA's Counterclaims. Id. On July 19, 2016, USAA filed a Motion for Attorney's Fees, as well as a Motion to Amend/Correct the Judgment. ECF Nos. 151, 153. On August 15, 2016, this Court granted the Motion to Amend/Correct the Judgment to reflect that USAA's Third Counterclaim was not moot because USAA seeks attorney's fees as part of the Counterclaim. ECF No. 185.

On September 20, 2016, this Court held a hearing on Plaintiffs' Motion to Dismiss the Counterclaim. ECF Nos. 104, 195. At the hearing, the Court ordered USAA to file an Amended Counterclaim, ECF No. 196, which was filed on October 4, 2016, ECF No. 200. On October 18, 2016, Plaintiffs filed an Answer, ECF No. 206, as well as a Motion to Dismiss USAA's Amended Counterclaim, ECF No. 204. On December 9, 2016, the Court denied the Motion to Dismiss. ECF No. 225. The Court also denied a Motion for a Protective Order, ECF Nos. 212, 225.[1]

On April 13, 2017, this Court denied Plaintiffs' Motion for Summary Judgment, ECF Nos. 305, 306, 307–1, 358. On April 18, 2017, this matter proceeded to a bench trial. ECF Nos. 365, 366, 367, 369, 370. On April 21, 2017, after USAA has completed its case-in-chief, Plaintiffs moved for Judgment on Partial Findings pursuant to Fed. R. Civ. P. 52(c). ECF No. 368. On April 24, 2017, following argument by the parties concerning the instant Motion, the Court granted Plaintiffs' Motion. ECF No. 370.

### B. FACTUAL BACKGROUND

Plaintiffs are the inventors of the previously sued-upon patent: Patent No. 8,266,-432 ("the '432 patent"), filed on September 15, 2008 and issued on September 11, 2012. ECF No. 70, Ex. A. See also PX–6. The patent is a method and system for the identification and authentication of users over the Internet. The patent identifies three entities that perform the patent's methods: (1) the "Central–Entity," which centralizes the personal and financial information of a "User" in a secure environment in order to prevent the distribution of the User's information in e-commerce; (2) the User, which represents both a typical person consuming goods and services as well as a business consuming goods and services, who needs to be identified in order to make online purchases or gain access to restricted web sites; and (3) the "External–Entity," which is any party offering goods or services in e-commerce and needs to authenticate the users based on digital identity. The User—for example, a potential customer of an online retailer—

---

1. The motion, filed by Plaintiffs, asked the Court to keep two attorneys—Mr. Reece Nienstadt and Mr. Jae Youn Kim—who had assisted or were assisting Plaintiffs in filings before the PTO, and who USAA alleged had either engaged in equitable conduct or whose work USAA alleged strengthened the inference of inequitable conduct, from being deposed. The Court, in denying the Order, limited the depo-

sition of the attorneys to issues related to the attorneys' work on and review of their filings with the PTO; the scope of their examinations of related patents in the claimed priority chains; their understanding of their obligations to the PTO; and their intent with respect to their filing before the PTO. ECF No. 225, at 12–13.

signs up with a Central–Entity and provides his or her personal and financial information. The Central Entity creates an account for the User and provides a Username and Password to the User. When the User wants to access the Central–Entity, the Central–Entity employs the Username and Password and also creates a "dynamic, non-predictable and time-dependent SecureCode" for the User when the User requests it. The Central–Entity keeps a record of the SecureCode. The User may then present his or her UserName and SecureCode to the External–Entity. The External–Entity will then forward the UserName and SecureCode to the Central–Entity. The Central–Entity will validate the information and inform the External–Entity of the result. ECF No. 140, at 2–4. As noted above, this Court previously held that the claims of the '432 patent at issue were invalid because they were directed to an abstract idea and thus ineligible for patent protection under 35 U.S.C. § 101. ECF No. 140, at 5–13.

At issue during the trial were representations made by the Plaintiffs to the United States Patent and Trademark Office ("PTO") during and after the prosecution of the '432 patent. Such representations concern at least three other patents in the same family of patents as the '432 patent: (1) Patent No. 7,356,837 ("the '837 patent"), filed on August 28, 2001 and issued on April 8, 2008; (2) Patent No. 7,444,676 ("the '676 patent"), filed on September 30, 2005 and issued on October 28, 2008; and (3) Patent No. 8,281,129 ("the '129 patent"), filed on January 18, 2006 and issued on October 2, 2012. PX–6. See also ECF No. 200, Ex. 5, at 22; ECF No. 356, at 19–20.

The relationship between these patents is pertinent to the disposition of the instant Motion. In essence, Plaintiffs have either previously claimed or are currently claiming that the '432 patent—which was filed on September 15, 2008—is entitled to the benefit of the earlier filing date of the '837 patent—that is, August 28, 2001—because of one of two claimed chains of priority within this family of patents: either (1) the '432 patent claims priority to the '676 patent as a continuation-in-part (previously claimed as a continuation) of the '676 patent, which in turn claims priority to the '837 patent as a continuation-in-part (previously claimed as a continuation) of the '837 patent, see infra IV.B.1–2; or (2) the '432 patent claims priority to the '129 patent as a continuation-in-part of the '129 patent, which in turn claims priority to the '837 patent as a continuation-in-part of the '837 patent, see infra IV.B.3. See also PX–6. USAA alleges that Plaintiffs made material misrepresentations to the PTO during and after the prosecution of the '432 patent application sufficient to render the family of patents unenforceable. See Trial Tr. at 12:5–6; 43:21–23, April 18, 2017.

## II. ATTORNEY'S FEES

■■■ The Patent Act includes its own attorney's fees provision, which authorizes district courts to award "reasonable attorney fees to the prevailing party" in "exceptional cases." 35 U.S.C. § 285 (1982). Exceptional cases are those that stand out "from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Octane Fitness, LLC v. ICON Health & Fitness, Inc., — U.S. —, 134 S.Ct. 1749, 1756, 188 L.Ed.2d 816 (2014). District courts "may determine whether a case is 'exceptional' in a case-by-case exercise of their discretion, considering the totality of the circumstances." Id. A totality of the circumstances assessment may include a consideration of "frivolousness, motivation, objective unreasonableness

(both in the factual and legal components of the case) and ... considerations of compensation and deterrence." Id. at 1756 n. 6. Such an assessment also includes a consideration of unreasonable conduct that is not "independently sanctionable." Id. at 1751.

 Inequitable conduct "may constitute the basis for an award of attorneys' fees under 35 U.S.C. § 285 (1982)." A.B. Chance Co. v. RTE Corp., 854 F.2d 1307, 1312–13 (Fed. Cir. 1988). Indeed, a district court has erred when it "[does] not make a determination of whether or not [the patentee has] engaged in inequitable conduct before the PTO." Id.

USAA has generally set forth three grounds for attorney's fees: (1) Plaintiffs had no factual or legal basis to file their multiple complaints, ECF No. 152, at 5; (2) Plaintiffs engaged in bad-faith litigation conduct, id. at 10; and (3) Plaintiffs and their agents engaged in inequitable conduct before the PTO throughout the prosecution of the '432 patent, ECF No. 154, at 3–6. Only the third ground was the subject of the April 2017 bench trial.

## III. STANDARD OF REVIEW

### A. STANDARD FOR JUDGMENT ON PARTIAL FINDINGS UNDER FED. R. CIV. P. 52(c) FOR INEQUITABLE CONDUCT CLAIMS

At the conclusion of USAA's case-in-chief, Plaintiffs moved for Judgment on Partial Findings, ECF No. 368, pursuant to Fed. R. Civ. P. 52(c), which provides:

(c) **Judgment on Partial Findings.** If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by

findings of fact and conclusions of law as required by Rule 52(a).

This District previously noted in Activevideo Networks, Inc. v. Verizon Communications, Inc., 2011 WL 13113818, at *2 (E.D. Va. Aug. 17, 2011):

When an issue is not before the jury, but is to be decided by the court, the court may enter judgment against a party on a claim or defense where the opposing party has been fully heard on the issue. See Fed. R. Civ. P. 52(c). Determinations relating to inequitable conduct are determined by the court rather than the jury. See PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1318 (Fed. Cir. 2000) ("The defense of inequitable conduct is entirely equitable in nature, and thus not an issue for a jury to decide.") Accordingly, the Court addresses the sufficiency of ... [the] showing of inequitable conduct.

### B. STANDARD FOR INEQUITABLE CONDUCT

 "Every patent applicant owes a duty of candor and good faith to the PTO." Arrow International, Inc. v. Spire Biomedical, Inc., 635 F.Supp.2d 46, 57 (D. Mass. 2009) (internal citations omitted). See also 37 C.F.R. § 1.56(a). "No patent will be granted on an application in connection with which fraud on the [PTO] was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct." 37 C.F.R. § 1.56(a). A breach of this duty of candor constitutes what is known as inequitable conduct and "renders all claims of the patent involved unenforceable." Synthon IP, Inc. v. Pfizer Inc., 472 F.Supp.2d 760, 775–76 (E.D. Va. 2007) (internal citations omitted). See also Activevideo Networks, Inc., 2011 WL 13113818, at *2. "Moreover, the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and

applications in the same technology family." Therasense Inc. v. Becton, Dickinson & Co, 649 F.3d 1276, 1288 (Fed. Cir. 2011) (internal citations omitted).

■ "Such impermissible inequitable conduct includes, inter alia, "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995).

■ This duty extends throughout the patent's entire prosecution history. Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd., 24 F.Supp.2d 537, 543 (E.D. Va. 1998), aff'd 204 F.3d 1368 (Fed. Cir. 2000). Furthermore, though inequitable conduct is generally based on conduct that occurred during the prosecution of the patent, "the Federal Circuit has also applied it to conduct that takes place after a patent has issued." 3D Medical Imaging Systems, LLC v. Visage Imaging, Inc., 228 F.Supp.3d 1131, 1336, 2017 WL 106018 at *3 (N.D. Ga. Jan. 11, 2017) (citing Ulead Sys., Inc. v. Lex. Computer & Mgmt. Corp., 351 F.3d 1139, 1144 (Fed. Cir. 2003).

In addition, the applicable federal regulations make clear that the duty of candor applies to "[e]ach individual associated with the filing and prosecution of a patent application[.]" 37 C.F.R. § 1.56 (stating that "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO], which includes a duty to disclose to the [PTO] all information known to that individual to be material to patentability"). The regulations at 37

C.F.R. § 1.56 define "[i]ndividuals associated with the filing or prosecution of a patent application" as including:

(1) Each inventor named in the application;

(2) Each attorney or agent who prepared or prosecutes the application; and

(3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

See also Molins PLC, 48 F.3d at 1178 n. 6.[2]

■ To prove inequitable conduct, the party alleging inequitable conduct must show "that the patent applicant (1) misrepresented or omitted information material to patentability and (2) did so with specific intent to mislead or deceive" the PTO. In re Rosuvastatin Calcium Patent Litig., 703 F.3d 511, 519 (Fed. Cir. 2012) (internal citation omitted). "Materiality and intent must be separately established." Id.

### 1. Intent to Deceive

■ To prove intent, "an individual associated with the filing and prosecution of a patent application" must have acted with specific intent to deceive the PTO. Therasense, 649 F.3d at 1290–91. Therasense considerably heightened the standard for inequitable conduct; in the past, the Federal Circuit had "espoused low standards for meeting the intent requirement, finding it satisfied based on gross negligence or even negligence." Id. at 1287–88 (internal citations omitted).

**2.** There, the Federal Circuit noted:

Under PTO rules, the duty to disclose information material to patentability rests on the inventor, on each attorney or agent who prepares or prosecutes an application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee, or with anyone to whom there is an obligation to assign the application.

■ Furthermore, intent must be demonstrated by clear and convincing evidence. Because direct evidence of intent is rare, a court "may infer intent from indirect and circumstantial evidence." Id. at 1290 (internal citation omitted).

> However, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence. Indeed, the evidence must be sufficient to require a finding of deceitful intent in the light of all the circumstances. Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. ... Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.

Id. (internal citations and quotations omitted).

■ Thus, "[a] finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not" does not satisfy this intent requirement." Id. (internal citations omitted). Instead, "[i]n a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." Id. Accordingly, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." Id. Thus, "[p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." Id. (emphasis added) (citing Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008) ("the fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct")). See also Astrazeneca Pharmaceuticals LP v. Teva Pharmaceuticals USA, Inc., 583 F.3d 766, 777 (Fed. Cir. 2009) ("The law is clear that inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold [information] where the reasons given for the withholding are plausible." (emphasis added) (internal citations and quotations omitted)).

■ Furthermore, "[b]ecause the party alleging inequitable conduct bears the burden of proof, the patentee need not offer any good faith explanation unless the accused infringer first ... prove[s] a threshold level of intent to deceive by clear and convincing evidence." Therasense, 649 F.3d at 1291 (internal citations and quotations omitted). "The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." Id.

### 2. Materiality

■ "The materiality required to establish inequitable conduct is but-for materiality." Id. at 1291. "When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." Id. The Federal Circuit has, however, noted an "unwillingness to extinguish the statutory presumption of validity where the patentee made a misrepresentation to the PTO that did not affect the issuance of the patent." Id.

■ Furthermore, "[a]lthough but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct," one exception exists "in cases of affirmative egregious misconduct." Id. at 1292. "When the patentee has engaged

in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material" Id. Thus, absent proving "but for" causation, the party trying to prove inequitable conduct may instead prove affirmative egregious misconduct—such as the filing of an unmistakably false affidavit. Id. at 1292–93. See also Ohio Willow Wood Co v. Alps South, LLC, 735 F.3d 1333, 1345.

The parties dispute whether the burden of proof for materiality—when considering inequitable conduct in light of a motion for attorney's fees—is a preponderance of the evidence or clear and convincing evidence. See ECF Nos. 348, at 3; 349, at 3. This District has also realized that such confusion exists:

> [C]ourts differ on the burden that applies to proving inequitable conduct. Some expressly state that the burden the court applies turns on at what point in the proceeding inequitable conduct is raised. For example, clear and convincing evidence is the standard when inequitable conduct is raised as a defense, but the preponderance of the evidence standard applies when it is raised as a basis for a fee award under [35 U.S.C.] § 285..... Other courts simply apply the clear and convincing standard when inequitable conduct is raised under § 285.

Stretchline Intellectual Properties Ltd. v. H&M Hennes & Mauritz LP, 2015 WL 5175196, at *5 (E.D. Va. Sept. 3, 2015). In that case, this District adopted the approach of DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc., 2015 WL 1284669, at *5 (E.D. Tex. Mar. 20, 2015):

> The parties dispute what the correct burden of proof is as to ... allegations of inequitable conduct. It is undisputed that proof of inequitable conduct requires "clear and convincing evidence." Star Scientific, Inc., 537 F.3d at 1365. [Defendant], however, argues that it

need only put forward a preponderance of the evidence per the standard in Octane Fitness, —— U.S. ——, [134 S.Ct. 1749, 188 L.Ed.2d 816]; it claims to use the label "inequitable conduct" merely as a shorthand. Since inequitable conduct is neither a necessary nor a sufficient condition for a finding of exceptionality, the evidence supporting the allegation stands on its own. Thus, the Court will consider that evidence as part of the "totality of the circumstances" inquiry required by Octane, and the totality of the evidence (including both evidence of alleged inequitable conduct and other evidence) will be weighed using the preponderance of the evidence standard. If the evidence of inequitable conduct is sufficient to satisfy the clear and convincing standard, the proof of inequitable conduct will be entitled to substantial weight in that calculation.

## IV. DISCUSSION

### A. BACKGROUND

At issue during trial were representations made by the Plaintiffs and their patent agents and attorneys to the PTO. As mentioned, such representations concern both the '432 patent and at least three other patents in the same family as the '432 patent: (1) the '837 patent, filed on August 28, 2001 and issued on April 8, 2008; (2) the '676 patent, filed on September 30, 2005 and issued on October 28, 2008; and (3) the '129 patent, filed on January 18, 2006 and issued on October 2, 2012. ECF No. 356, at 2–3; 18–19. Also at issue were representations made to the PTO during the prosecution of another related patent application, the '538 application, which was filed on September 7, 2012 as a continuation of the '432 patent and published on February 7, 2013. Id. at 21.

In relation to these patents, USAA specifically alleged that five individuals engaged in inequitable conduct: (1) Nader Asghari–Kamrani, Plaintiff and co-inventor of the '432 patent; (2) Kamran Asghari–Kamrani, Plaintiff and co-inventor of the '432 patent; (3) Dr. Bijan Tadayon, Plaintiffs' initial patent agent during the prosecution of the '432 patent; (4) Michael P. Fortkort, another one of Plaintiffs' patent attorney during the prosecution of the '432 patent and the patent attorney who obtained the issuance of the '432 patent; and (5) Jae Youn (Steve) Kim, one of Plaintiffs' patent attorneys for the '432 patent for post-issuance proceedings in the PTO. See Trial Tr. at 13:11, 22; 14:7–8; 15:8–9; 15:25–16:1, April 18, 2017. USAA also advised that the actions of at least two other individuals did not amount to inequitable conduct as to the '432 patent but bore significantly on the inequitable conduct of previously listed five individuals: (1) Veronica–Adele Dela Roca Cao, Plaintiffs' patent attorney (after Dr. Tadayon and before Mr. Fortkort) during the prosecution of the '432 patent, see id. at 14:22–25; 15:1, and (2) Reece Nienstadt, who is both one of Plaintiffs' trial counsel and one of Plaintiffs' patent attorneys in the prosecution of the related '538 application, see id. at 15:15–24.

Briefly, USAA alleged at least four instances of inequitable conduct. First, USAA alleged that during the prosecution of the '432 patent, Dr. Tadayon materially misrepresented the priority claims of the '432 patent in order to obtain the benefit of the '837 patent's filing date. Furthermore, Plaintiffs and Mr. Fortkort failed to correct such a misrepresentation (Ms. Cao also failed to correct such a misrepresentation but, as mentioned, USAA does not allege inequitable conduct on her part). Second, after USAA put Plaintiffs on notice of the misrepresentation during the course of this litigation, Plaintiffs filed a pro se petition with the PTO attempting to correct the priority claims; USAA alleged that Plaintiffs falsely swore in the petition that the delay in correcting the priority claims was unintentional. Third, after USAA put Plaintiffs on notice of the misrepresentation, Mr. Kim filed certificates of correction with the PTO attempting to claim a new chain of priority back to the '837 patent through the '129 patent; USAA alleged that Mr. Kim falsely swore in these certificates that any delay in claiming such a priority chain was unintentional. Fourth, USAA alleged that Plaintiffs engaged in inequitable conduct by filing false NPRs with both the '676 and '129 patents. See infra IV.B.1–4.

In response, Plaintiffs' Motion generally contends that, as to every individual that USAA has alleged of inequitable conduct, USAA has failed to meet the legal standard under Therasense for inequitable conduct. With respect to specific intent, Plaintiffs argue that "USAA has not proven, as to any accused individual, that the single most reasonable inference able to be drawn from the evidence is that a specific individual committed the alleged material misconduct with specific intent to deceive the [PTO]." ECF No. 368, at 1–2 (internal quotations omitted). Similarly, with respect to materiality, Plaintiffs argue that USAA has not established—by either clear and convincing evidence or a by preponderance of the evidence—that the pro se filing by the Plaintiffs (the second allegation of inequitable conduct); Mr. Kim's filings (the third allegation); or the NPRs filed with the '676 and '129 patents (the fourth allegation) were either (1) "unmistakably false affidavits" constituting affirmative acts of egregious misconduct or (2) but-for material. Id. at 3–4. (However, with respect to the first allegation of inequitable conduct, a priority claim is inherently material as it determines what may be considered prior art and what may not. Trial Tr. at 12:12–

14, April 18, 2017.) The Court will now address, in relation to the instant Motion, each alleged instance of inequitable conduct in turn.

## B. Alleged Inequitable Conduct

### 1. First Allegation: Mislabeling of the '432 Priority Chain

First, USAA alleges that Plaintiffs and their lawyers and agents either materially misrepresented the priority claims of the '432 patent or failed to correct such misrepresentations. At issue are two types of priority claims: "continuations" and "continuations-in-part." While a patent application is pending, the applicant may file a continuation application; this continuation application discloses that same application—that is, it must have the same specification as the pending patent application—and may attempt to add more claims to it. Trial Tr. at 19:19–25, April 18, 2017. See also Manual of Patent Examining Procedure ("MPEP") § 201.07. This continuation application claims priority back to the originally-filed application; in this manner, the continuation priority claim essentially treats the later-filed continuation application (the "child" patent) as if it were the same as the patent to which it claims priority (the "parent" patent) by giving the later-filed child patent the benefit of the earlier-filed patent's filing date. 35 U.S.C. § 120.[3] This date then defines the scope of prior art that is available to the patent examiner, thereby potentially limiting the prior art that may invalidate the patent claims in the continuation application. 35 U.S.C. § 102(d).[4]

By contrast, a continuation-in-part repeats a substantial part or all of the prior application's specification but adds new subject matter/material not disclosed in the parent patent application. Trial Tr. at 26:8–12, April 18, 2017. Thus, the child patent is treated as substantially similar to

---

**3.** 35 U.S.C. § 120 states:

An application for patent for an invention disclosed in the manner provided by section 112(a) (other than the requirement to disclose the best mode) in an application previously filed in the United States, or as provided by section 363 or 385, which names an inventor or joint inventor in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application. No application shall be entitled to the benefit of an earlier filed application under this section unless an amendment containing the specific reference to the earlier filed application is submitted at such time during the pendency of the application as required by the Director. The Director may consider the failure to submit such an amendment within that time period as a waiver of any benefit under this section. The Director may estab-

lish procedures, including the requirement for payment of the fee specified in section 41(a)(7), to accept an unintentionally delayed submission of an amendment under this section.

**4.** 35 U.S.C. § 102(d) states:

(d) Patents and published applications effective as prior art.—For purposes of determining whether a patent or application for patent is prior art to a claimed invention under subsection (a)(2), such patent or application shall be considered to have been effectively filed, with respect to any subject matter described in the patent or application—

(1) if paragraph (2) does not apply, as of the actual filing date of the patent or the application for patent; or

(2) if the patent or application for patent is entitled to claim a right of priority under section 119, 365(a), 365(b), 386(a), or 386(b), or to claim the benefit of an earlier filing date under sections 120, 121, 365(c), or 386(c), based upon 1 or more prior filed applications for patent, as of the filing date of the earliest such application that describes the subject matter.

the previous parent patent but adding new matter. See MPEP § 201.08. Only the claims that were adequately disclosed in the parent patent receive the benefit of the parent patent's filing date, while any claim that "recites a feature which was first introduced in the continuation-in-part application and was not adequately disclosed in the parent application . . . is not entitled to the filing date of the parent application." Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc., 98 F.3d 1563, 1575 (Fed. Cir. 1996). If a claim does not receive the priority date of the parent patent, it instead receives the priority date for when the continuation-in-part application was filed.

▮▮▮▮▮ Thus, while a patent application for a continuation receives the priority date of the earlier-filed parent patent, a patent application for a continuation-in-part instead receives a claim-by-claim assessment as to whether each particular claim in the later-filed child patent may receive the benefit of the priority date of the earlier parent patent. Crucially, a priority claim, whether for a continuation or continuation-in-part, can only be filed while the parent patent remains pending. Once the parent patent has issued, it becomes a part of the public domain and the potential child patent cannot claim priority to it—thus, the applications for the child and parent patents must be co-pending in order for a patentee to file either a continuation or continuation-in-part application. See 35 U.S.C. § 120.

▮▮▮▮ At trial, USAA argued that the '432 patent is unenforceable because Dr. Tadayon, the Plaintiffs, and Mr. Fortkort all engaged in material misrepresentation of the 432 patent's priority claims or failed to correct such misrepresentation, thereby violating their duty of candor to the PTO and engaging in inequitable conduct. When the '432 patent application was filed, Dr. Tadayon represented that the patent-in-suit, the '432 patent, was (1) a continuation of the '676 patent (the "parent" patent), which (2) itself was a continuation of the '837 patent (the "grandparent" patent), and that (3) the '432 patent was therefore entitled to a priority date other than its filing date—that is, the filing date of the '837 patent. PX–6. See also ECF No. 356, at 21. However, the parties agree that the correct relationship between the three patents is that of continuations-in-part, not continuations, and that Dr. Tadayon mislabeled the priority claims of the '432 patent by labelling the relationship between the '432 patent, the '676 patent, and the '837 patent as that of continuations. See ECF No. 356, at 20, 35. Furthermore, during the prosecution of the '432 patent, neither the Plaintiffs nor Plaintiffs' other agents/attorneys—namely, Mr. Fortkort, who obtained the issuance of the '432 patent, Trial Tr. at 15:10, April 18, 2017, but also Ms. Cao (who was not accused of inequitable conduct)—corrected this mislabeling. As a priority claim is inherently material, see Trial Tr. at 12:12–13, April 18, 2017, the main question before the Court in determining inequitable conduct was whether the Plaintiffs, Dr. Tadayon, and Mr. Fortkort acted with the specific intent to deceive the PTO.

At trial, USAA argued that Dr. Tadayon, Plaintiffs, and Mr. Fortkort specifically intended to deceive the PTO. According to USAA, Plaintiffs and their patent agents/attorneys did so in order to keep the '432 patent from being anticipated by its own grandparent patent, the '837 patent, which has the same specification as the '432 patent. Trial Tr. at 12:15–19, April 18, 2017.

More specifically, in August 2001, Plaintiffs filed the patent application that led to the '837 patent, which is identical in specification to the '432 patent and therefore,

once it had issued, would have "[made the '837 patent] perfectly anticipatory invalidating prior art." Id. at 25:3–4. That is, because (1) the specification of the '432 patent is identical to the specification of the '837 patent and (2) the specification of the '837 patent was in the public domain before the '432 patent was filed, the '837 patent would have been considered prior art by the patent examiner and therefore anticipated the '432 patent. Plaintiffs, in turn, would not have been able to "get an invention on something [already] in the public domain." Id. at 25:9–14. See also Trial Tr. at 970:19–25, April 24, 2017. The only way to avoid this would have been to file the '432 patent as a continuation application while the '837 patent was still pending. Trial Tr. at 21:21–25, April 18, 2017.

However, the '837 patent issued on April 8, 2008, while the '432 patent application was not filed until September 15, 2008. See PX–6. Thus, Plaintiffs missed their opportunity to file a continuation claim back to the '837 patent. As a result, according to USAA, Plaintiffs instead chose to attempt to claim priority back to the '837 through the '676 patent—filed on September 30, 2005 and issued on October 28, 2008—which (1) was filed when the '837 patent was still pending and (2) was still pending at the time the '432 application was filed. Plaintiffs and their patent agents/attorneys did so, USAA argued, to avoid having the '432 patent invalidated by the previously-issued '837 patent, which would have been considered anticipatory prior art. Trial Tr. at 25:2–4, April 18, 2017.

However, USAA argued, in order to do so, Plaintiffs and their agents misrepresented the relationship between the three patents by having Dr. Tadayon claim that the '432 patent was a continuation of the '676 patent, and the '676 patent as a continuation of the '837 patent. USAA further argued that because Plaintiffs and their agents used the continuation designa-

tion, notifying the PTO that the specifications were the same, the PTO "never had a reason to think about continuity of disclosure"—that is, the PTO "never had a reason to wonder whether the '676 [was] the same disclosure as the '432 patent because [the Plaintiffs and their agents] called it a continuation." Id. at 27:14–21. See also Trial Tr. at 973:2–23, April 24, 2017.

However, the '676 patent has a different disclosure than the '432 patent. See Trial Tr. at 23:7–11, April 18, 2017. See also PX–6. Furthermore, the '676 patent was filed with a NPR, certifying, according to USAA, that it was a different invention than the '837 patent. Trial Tr. at 24:7–8, April 18, 2017. See infra IV.B.4. Thus, USAA argued, there was a "break in the chain," and the '432 patent could not claim priority through the '676 patent as a continuation. Trial Tr. at 24:9, April 18, 2017. By filing the continuation application despite their knowledge that the three patents in the priority chain were not continuations of one another or failing to correct this mislabeling, USAA argued that Plaintiffs, Dr. Tadayon, and Mr. Fortkort all violated the (1) duty of candor to the PTO and (2) duty to disclose the correct priority claims of the '432 patent to the PTO.

At trial, USAA pointed to other evidence strengthening the inference of intent to deceive. First, USAA argued that Dr. Tadayon's actions were deliberate because he "is a sophisticated practitioner" with stellar academic credentials and experience as a former patent examiner. Trial Tr. at 971:14–19, April 24, 2017. According to USAA, Dr. Tadayon would have known the difference between a continuation versus a continuation-in-part. See id. Furthermore, "Dr. Tadayon knew of the pending applications [to which the '432 patent application was claiming priority] because he recited them in the priority claim." Id. at 976:22–15. Second, as to both Dr. Tadayon's and

Plaintiffs' intent, USAA argued at trial at the "intention to deceive arises because, as Nader Asghari–Kamrani testified, what they wanted to do was file a continuation of the '837 patent. So what they wanted to do was circumvent the act that the '837 patent issued and, later in time, realized." Id. at 976:5–9. Third, as to the intent of Mr. Fortkort—who was counsel of record during the issuance of the '432 patent and during the filing of the application for the '538 application—the '538 patent application was filed reflecting the original and erroneous continuity claims of the '432 patent (that is, reflecting that the relationship between the '432, '676, and '837 patents was that of continuations). The filing receipt for the '538 patent noted this error and a separate error in a provisional application. Mr. Fortkort corrected the second error related to the provisional application, but failed to correct the continuity errors. The PTO then issued a corrected filing receipt, noting the remaining continuity error as to the '432 priority chain. ECF No. 356, at 21–22. According to USAA, during the prosecution of the '538 application, Plaintiffs relied on the '432 patent's faulty priority claim to overcome prior art. Id.

As additional evidence of inequitable conduct—though not a separate claim of inequitable conduct—USAA points to the actions of Plaintiffs' current litigation counsel, Reece Nienstadt, who is also prosecuting the '538 patent, a continuation of the '432 patent. Trial Tr. at 15:15–24, April 18, 2017. In an Information Disclosure Sheet filed with the PTO, Mr. Nienstadt "[made] surreptitious changes to the priority claims" by stating that the '432 patent was filed as a continuation-in-part of the '676 patent, which in turn was filed as a continuation-in-part of the '837 patent. Id. at 28:23–25; 29:1–3. See also ECF No. 356, at 22–23. However, at the time the Sheet was filed, the priority claims of the '423 patent remained as filed (that is,

the '432 patent was still represented as a continuation of the '676 patent, which in turn was represented as a continuation of the '837 patent), and had not been corrected to reflect that they were continuations-in-part. ECF No. 356, at 23. ECF No. 200, at 29–30. USAA argued this misstatement in the later-filed Sheet is indicative of a broader intent to deceive in the past applications. See also McKesson Information Sol'ns, Inc. v. Bridge Medical, Inc., 487 F.3d 897, 918 (Fed. Cir. 2007) (relying on patent counsel's conduct in a related application, after he had become aware of the material information, to infer intent to deceive).

Although the Court found that USAA had presented sufficient evidence such that intent to deceive was one reasonable explanation, the Court nonetheless declined, based on a review of the evidence before the Court, to find that USAA had proven, by Therasense's clear and convincing standard, a specific intent to deceive on the part of Dr. Tadayon, Plaintiffs, or Mr. Fortkort.

First, more generally, Plaintiffs provided a reasonable, overarching explanation as to all four instances of inequitable conduct: both Nader and Kamran Asghari–Kamrani testified that, when they were filing the application for the '432 patent with the PTO—as with all of their patent filings—they were attempting to do so in the most cost-efficient manner possible. In support of this, Nader Asghari–Kamrani testified that they originally hired Dr. Tadayon to file the '432 application because of his reasonable rates. Trial Tr. at 406:3–25; 407:1–4, April 20, 2017. He further testified that they then parted ways with Dr. Tadayon and hired Ms. Cao because Dr. Tadayon's rates had became too high. Id. He did testify that they did not switch from Ms. Cao to Mr. Fortkort because her rates were too high; rather, they ex-

plained, they hired Mr. Fortkort, who was located near the Plaintiffs in Northern Virginia, because Ms. Cao was located in Arizona and they preferred face-to-face contact with their lawyer. Id. They then parted ways with Mr. Fortkort because his rates had also become too costly for them, eventually retaining Mr. Kim and members of his law firm as their patent attorneys. Id.

Accordingly, the Court found the Plaintiffs sought to proceed in a manner that would incur the least possible expense, hiring attorneys to accomplish the end desired with respect to each filing. It would appear that negligence or a lack of thoroughness was not a consideration as it would entail undue expense; this, in turn, resulted in the utilization of a series of attorneys, ostensibly creating confusion.

In turn, each agent/attorney testified to the relatively limited nature of their intake and review procedures for each patent filing. Each agent/attorney testified that although they review the specific aspect of each patent application that he or she has been hired to file, they do not necessarily review the entirety of the patent file—let alone the related patents in the same family—before filing with the PTO. This is in part due to (1) the volume of paperwork and extent of each application, which can number in the thousands of pages, see, e.g., Trial Tr. at 512:4–22, April 20, 2017; Trial Tr. at 1023:14–15, April 24, 2017, and (2) the number of applications an attorney is handling at any given time, see, e.g., Trial Tr. at 489:24–25; 490:1–6, April 20, 2017. Each attorney also testified to the relatively abbreviated amount of time they spend on reviewing such files, given the workload described above. See, e.g., id. at 492:2–17; 494:1–23; see also Court Exs. 1, 2. For example, Mr. Fortkort testified that he did not have a specific process for reviewing new clients' applications as "[i]t depends ... on each client and ... what

their needs are and what's being asked me." As a result, if costs were a factor, when reviewing the file history, Mr. Fortkort testified he "wouldn't necessarily do something that wasn't needed to accomplish what I needed to do, so I might not go back and look at all the supporting documents, depending on what I needed to do to prosecute the case before the [PTO]." Trial Tr. at 492:4–13, April 20, 2017. See also id. 488:7–9 ("You can't run up the bill on the small inventor. You have to be mindful of how much time you're spending and do what is necessary."); 489:7–11. Based on such testimony, as well as the testimony outlined below, the Court found that the Plaintiffs depended on their attorneys to file the '432 patent and navigate PTO procedures but, as the result of both Plaintiffs' cost-consciousness, the volume of the patent files, and the attorneys' standard intake and office procedures, the review of Plaintiffs' application was limited in scope. Thus, the Court found it was plausible that the Plaintiffs and their attorneys did not necessarily thoroughly review the scope of the priority claims and made a mistake in filing the '432 patent with the priority claims outlined in its original application.

More specifically as to the Plaintiffs, both Plaintiffs testified that although both were knowledgeable about their inventions, neither was an experienced patent attorney skilled in the most effective filing strategy for their patents. For example, Nader Asghari–Kamrani testified that he and his brother relied on and "received advice from [Dr. Tadayon]" as to filing a continuation. Trial Tr. at 394:3–12, April 19, 2017. Similarly, Kamran Asghari–Kamrani noted that he and his brother were "relying on our patent attorney [to take care of the legal aspects of filing the patent application] because we are engineers" and, furthermore, that, "at that point [when the '432 patent application was be-

ing filed], we had no knowledge" about the difference between continuations and continuations-in-part. Id. at 350:1–12. Thus, Plaintiffs testified, they would not necessarily have known the difference between a continuation and a continuation-in-part, and what representation of such a relationship would have meant in the context of a patent application. See id. at 349:24–25; 350:1–12. The Court found, based on their testimony, that a misunderstanding as to what a particular priority claim constituted was just as plausible an explanation as intent to deceive.

As to Dr. Tadayon, although parts of his testimony appeared to support an inference of intent to deceive (for example, he testified that he believed that the priority claims he made in the filings were correct (and thus not a mistake), see Trial Tr. at 978:19–25; 979:1, April 24, 2017) the Court found there was insufficient evidence to establish by clear and convincing evidence that he had acted with the intent to deceive. A number of points that arose at trial support this finding. First, Dr. Tadayon explained generally that if a client comes to him with a patent that has already-filed applications, he does not necessarily review those other applications besides the continuity information related to the case in front of him. In doing so, his main concern is the effective filing date of the application in front of him. See Court Ex. 1. Furthermore, as Plaintiffs argued at trial, there was no reason for Dr. Tadayon to have made this mistake intentionally; for example, Plaintiffs argued, "he didn't have to make that mistake" as instead "he could have claimed priority, if he would have known, through the '400 application, labeled it a continuation-in-part" and thus effectively achieved the same result as the original filing. Trial Tr. at 1022:1–5, April 24, 2017. Finally, as Plaintiffs noted, even experts in PTO procedure testified inconsistently as to whether a patent applicant could claim priority to claims that aren't co-pending—thus, "even the most experienced people can get it wrong." Id. at 1023:7–19. When combined with "file histories that are thousands ... of pages," as well as concerns over cost for both the Plaintiffs and the patent agents/attorneys, it was reasonable for him to make a mistake. Id. Based on these points, the Court found it was reasonable to infer Dr. Tadayon may have been less-than-thorough in his review of the priority claims or made a significant mistake; accordingly, the Court declined to find that he acted with the specific intent to deceive.

As to Mr. Fortkort, Mr. Fortkort testified at trial that there was not necessarily a reason for him to examine the previously-filed patents to determine whether they fully supported a claim of priority as a continuation. Trial Tr. at 489:7–10, April 20, 2017 (describing how he would only review an application filed by somebody else "depending on the issues that come up during prosecution"); see also id. at 492:4–13, 513:10–16. He also testified that his filings were only meant to address the subject matter of the patent with regard to the prior art that the PTO had directed his attention to through written correspondence, and thus because he had not been directed to address the parent and grandparent patent, there was no need to delve into those priority claims. Trial Tr. at 436:1–8 ("We were addressing the merits of the subject matter of the application relative to the prior art that the [PTO] asserted, so ... there was no reason to delve into the priorities.").

He also testified that he was unsure as to why he did not address the PTO's correspondence flagging the potential priority issue, but did note that standard practice within his firm was to have his paralegal handle correspondence from the PTO and address any of the issues. Trial Tr. at 469:23–25; 472:11–12, 514:4–8, April 20,

2017. At the time, he testified, he would have done so with the '538 application, and would have signed off such work by his paralegal. Id. Were there to have been a significant issue with the priority chain, he testified, he would have looked further into the issue.

Altogether, given that the Court found Mr. Fortkort's explanation—in light of the volume of the filings that occur with each patent, the number of patent applications a patent attorney is handling, and the cost-efficient manner in which Plaintiffs were attempting to handle their filings—to be plausible, the Court was unable to find that intent to deceive was the single most reasonable inference. Though Mr. Fortkort's work may have been less-than-thorough, where such an explanation is just as reasonable as intent to deceive, the Court declined to find inequitable conduct.

Thus, (1) given both the relatively limited scope of the review of the '432 patent application; (2) the limited scope of review, if any, of related patents, particularly the '676 and '837 patents; (3) the complexity of this area of patent law, see Trial Tr. at 1023:7–19, April 24, 2017; and (4) Plaintiffs' frequent rotation of attorneys, all of whom were hired (except for Ms. Cao) to work in a cost-efficient manner, the Court found that the Plaintiffs and each of their attorneys may have failed to review the scope of the priority claims and thereby inadvertently failed to notice the mislabeling of the priority claims. Although such failure to carefully review the scope of the priority claims may have been careless or negligent, because the Court found that that this was on its face a plausible explanation, it declined to find inequitable conduct.

As this District has noted in assessing inequitable conduct claims, such explanations for need only be on their face plausible. Activevideo Networks, 2011 WL 13113818, at *3. Although USAA submit-

ted what appears to be an equally plausible explanation for the mislabeling—an intent to deceive the PTO in order to gain the priority date of the '837 patent so that the '432 patent would not be anticipated by the '837 patent—where a plausible alternative explanation that does not go to inequitable conduct also exists, a court cannot find a specific intent to deceive—rather, such intent must be the single most reasonable inference. Thus, USAA failed to establish by clear and convincing evidence intent to deceive on the part of Dr. Tadayon, Mr. Forkort, and the Plaintiffs with respect to the mislabeling of the priority claims.

### 2. Second Allegation: Unintentional Delay in Correcting '432 Priority Chain

■ On February 8, 2016, during the course of this litigation, Plaintiffs were made aware of the mislabeling in the priority chain by USAA. On February 22, 2016, Plaintiff Nader Asghari–Kamrani filed (1) a pro se Petition to Accept an Unintentionally Delayed Claim for the Benefit of Prior–Filed Nonprovisional Applications Under Pre–AIA 37 C.F.R. § 1.78(a)(3) (emphasis added) and (2) a Request for Certificate of Correction of the '432 Patent. These documents requested that the PTO correct the mislabeling in the priority claims so as to amend the relationships within the priority chain for the '432 patent from continuations to continuations-in-part. The filing included the following sworn statement: "The entire delay between the date the claim was due under pre-AIA 37 C.F.R. § 1.78(a)(2)(ii) and the date the benefit was filed was unintentional" (emphasis added). See ECF No. 307–1, at 3; ECF No. 325, at 8, 24. (The Petition was never acted on by the PTO and did not seek to make any other changes to the '432 patent's priority claim.)

USAA argues that Plaintiffs' actions and statements with respect to the pro se filing

indicate that (1) the delay was not unintentional and (2) was instead the result of an intent to deceive the PTO so as to keep the '432 patent from being invalidated by the '837 patent as prior art. In support of this, USAA points to four issues. First, USAA argued at trial that the changes in the petition were "not consistent with the inventor's testimony as to what the intention was in filing the '432 patent. The testimony we read earlier was that Mr. Nader Asghari–Kamrani wanted to file a continuation, yet he changed his priority claims to a continuation-in-part." Trial Tr. at 978:13–18, April 24, 2017. However, USAA argued, once they found out that they would not be able to do so if the priority chain was no longer valid, Plaintiffs engaged in this attempt to hide the misrepresentation and keep the '432 patent from being invalidated by the '837 patent.

Second, although Plaintiffs were represented by Mr. Kim's firm before the PTO at the time that they filed the pro se petition for correction, they did so without Mr. Kim or other members of his firm. Instead, Mr. Nienstadt,[5] the attorney of record for the Plaintiffs in this case, drafted and provided Plaintiffs with a draft Certificate of Correction to alter the priority claims of the '432 patent; this draft contained changes analogous to the changes he attempted to make in the '538 application. ECF No. 356, at 23–24. Thus, USAA argued, the only reason why Plaintiffs would file such petitions pro se despite being represented by counsel before the PTO is because counsel understood that such a claim of an unintentional delay was false.

Third, the Plaintiffs "did not contact the former lawyers before changing the continuation claims to a continuation-in-part" to check whether the lawyers "had an intent to make the claims the way they were or to keep them the way they were," which would have indicated whether the delay was indeed unintentional. Trial Tr. at 981:5–13, April 24, 2017.

Finally, USAA pointed to inconsistencies in Plaintiffs' testimony and understanding of the relationship between the patents. As USAA noted, a continuation-in-part must, by definition, add subject matter. However, according to the testimony of Nader Asghari–Kamrani, the '432 patent discloses no new subject matter in relation to the '676 patent, the claimed parent patent. Id. at 14–23. Thus, according to USAA, such a filing would have not made any sense. In combination with the issues outlined above, the only reason that the Plaintiffs made such a filing would have been to keep the continuity claim of the '432 patent alive so as to keep it from being invalidated by the '837 patent.

5. At trial, the Court found and noted that Mr. Nienstadt occupied an unusual position in this litigation by appearing to insert himself into—or, at the very least, by not withdrawing from—the underlying facts. See also Order Den. Mot. for Protective Order, ECF No. 225. Furthermore, the Court found, as USAA noted, that Mr. Nienstadt and his firm had a financial stake in the outcome of this litigation. See ECF No. 356, at 34.

As a result, the Court found that Mr. Nienstadt's offers to represent Plaintiffs' previous patent agents/attorneys during their depositions and his actions during the depositions were indeed highly unusual (particularly when one witness, Dr. Tadayon, had a separate attorney representing him in his deposition). Furthermore, the Court noted that it appeared that Mr. Nienstadt had utilized this representation and the guise of attorney-client privilege to keep these witnesses from testifying to certain material. See, e.g., ECF Nos. 325–10; 325–20; 325–24. The Court found such actions highly unusual; after all, if witnesses were to become clients to the attorneys of record on a regular basis, attorneys could employ such a tactic to keep witnesses from testifying to select matters. The Court found the actions were due mostly to the inexperience of Mr. Nienstadt in litigation.

Nonetheless, at trial, the Court declined to find that Plaintiffs acted with the specific intent to deceive or that the petition was an unmistakably false affidavit. First, at the trial, Nader Asghari–Kamrani testified that the reason Mr. Nienstadt did not file the petition on the Plaintiffs' behalf was because he was not the attorney of record for the 432 patent with the PTO; rather, Mr. Kim was. He further testified that he would have had Mr. Kim or another member of Mr. Kim's firm file the petition but for the fact that the firm represented to him that it was busy at the time. As he wanted no further delay in correcting the priority chain, and because either he or Mr. Kim had to file the petition (based on his understanding), he went ahead and instead filed the petition himself. The Court found that this explanation was, on its face, plausible. Trial Tr. at 395:19–25; 396:21–25; 3397:1–8, April 20, 2017.

Second, as to the statement that the entire delay was unintentional, Nader Asghari–Kamrani further testified that he and his brother did conduct an investigation and reviewed the file history of the patent family to confirm the correct priority chain and to ensure that the Plaintiffs had not previously been informed or were aware of the correct priority claims. Mr. Asghari–Kamrani testified that the application for the '432 patent was Plaintiffs' through its lifetime, the Plaintiffs had possession to all relevant files, and Plaintiffs presumably could not recall any of their former counsel as having informed of them of a mislabeling; thus, he testified, he and his brother felt they had adequately conducted a review of the priority claims prior to filing the pro se petition to ensure that

any delay in filing the petition was unintentional. He further testified that following a review of their files, he did not feel that there was any need to contact or question their past attorneys regarding whether claiming this type of priority claim was the result of an intentional delay. As discussed, he testified that no previous attorney had ever informed him of an issue with the priority chain, so he believed at the time of the filing of the petition that that was the first time that the issue with the priority chain had been discovered. Id. at 397:16–25; 398:1–7. Thus, the Court found the explanation Mr. Asghari–Kamrani provided as investigating to certify that the delay was not intentional was, on its face, to be plausible.

In 3D Medical Imaging Systems, LLC, the Northern District of Georgia found that a patent owner—who had acquired the patent when the previous patent owner went bankrupt—had engaged in inequitable conduct in claiming an unintentional delay in the late payment of a maintenance fee for the patent in part because (1) he had no personal knowledge of the reason for the non-payment of the maintenance fee by the previous owner, and (2) because he had not conducted any investigation into the circumstances concerning the non-payment of the maintenance fee and whether such a failure to pay was intentional or unintentional, and therefore "submitted the Petition without any idea of whether his certification [of unintentional delay] was true" 228 F.Supp.3d at 1334–35, 1337, 2017 WL 106018, at *2, *4 (citing Network Signatures, Inc. v. State Farm. Mut. Auto. Ins. Co., 731 F.3d 1239, 1243 (Fed. Cir. 2013)).[6]

---

6. 3D Medical Imaging Systems, LLC distinguished the facts—also concerning a petition citing unintentional delay in the payment of a maintenance fee—in its case from Network Signatures in the following way:

The [attorney in Network Signatures who filed a petition to accept an unintentionally delayed payment] had personal knowledge of the reasons for non-payment; [the attorney in 3D Medical Imaging Systems, LLC] did not. When he submitted the petition,

Here, however, Plaintiffs testified that they did conduct an investigation to determine if there was a reason as to whether the delay was intentional or unintentional, and therefore whether their certification of unintentional delay was true. Thus, where Plaintiffs' explanation is, on its face, plausible, intent to deceive cannot be found—even if USAA's explanation is also just as, or even more, plausible. Accordingly, USAA cannot meet the heightened specific intent standard under Therasense as a matter of law. ECF No. 307–1, at 23. Similarly, as to materiality, because the Court found that the Plaintiffs' testimony attesting to their belief that the delay was not intentional to be plausible, it declined to find that the signing of the petition was unmistakably false.

### 3. Third Allegation: Unintentional Delay in Alleging New Priority Chain through '129 Patent

■ On August 8 and 30, 2016, Mr. Kim, Plaintiffs' patent attorney for the '432 patent in post-issuance proceedings before the PTO, filed petitions with the PTO to claim a benefit for the '432 patent back to the '837 grandparent patent through the '129 patent, whose application had been filed on January 18, 2006. ECF No. 307–1, at 6. The relationship between the '432–'129–'837 priority chain is as continuations-in-part. The first petition, filed on August 8, 2016, informed the PTO that the potential new priority claim through the '129 patent was discovered "on or about July 6, 2016." Id. at 11. The first

petition also contained a sworn statement that "the entire delay between the date the [priority] claim was due under pre-AIA CFR § 1.78(a)(2)(ii) and the date the benefit claim was filed was unintentional" (emphasis added). Id. at 10. This first petition was rejected "for failure to satisfy a variety of procedural requirements." Id. at 11. The second filing, submitted on August 30, 2016, contained the same sworn statement concerning an unintentional delay. Id.

However, USAA noted at trial that the submission of the petition amounted to inequitable conduct because the statement regarding unintentional delay was unmistakably false and because it was submitted with intent to deceive the PTO. In support of this, USAA argued that either Plaintiffs or Plaintiffs' previous counsel would have been put on notice of any potential relationship between the '432 and '129 patents back in 2011; thus, any statement of an unintentional delay was false. In support of this, USAA specifically advised that, first, in 2011, during the filing of the applications leading to the '432 and '129 patents, Mr. Fortkort—one of the '432 patent attorneys—filed powers of attorney in both of the applications leading to the '432 and '129 patents on the same day. Trial Tr. at 39:3–4, April 18, 2017.

Second, after multiple double-patenting rejections by the patent examiner as to the '432 and '129 patents, on December 12, 2011, during the prosecution of the '432 patent, Mr. Fortkort filed mutual terminal disclaimers in the applications leading to

[the Network Signatures attorney] knew that the reason he did not pay the maintenance fee was his mistaken belief that there was a lack of commercial interest in the patent. Whether he was right or not, he could have thought that his mistake of fact meant his non-payment was indeed "unintentional." Put another way, he at least knew of facts that informed his certification. Not so with [the 3D Medical Imaging Systems LLC attorney]. It is undisputed

that [the 3D Medical Imaging Systems LLC attorney] had no personal knowledge of . . . [the reason] for failing to pay the maintenance fee on time. . . . Nor did he conduct any investigation into whether . . . the failure to pay was intentional or unintentional. . . . So unlike the [Network Signatures attorney], [the 3D Medical Imaging Systems LLC attorney] submitted the Petition without any idea of whether his certification was true.

both patents on the same day, filing a Terminal Disclaimer to Obviate a Provisional Double Patenting Rejection Over a Pending "Reference" Application on behalf of the Plaintiffs that terminally disclaimed the application for the '129 patent. He also filed a terminal disclaimer disclaiming the '129 patent application to the '432 patent application. Id. at 39:5–6. USAA argued this double patenting rejection necessarily put the Plaintiffs, Mr. Fortkort, and, later, Mr. Kim on notice in acknowledging both the existence of the application for the '129 patent and the potential relationship to the application for the '432 patent.

Third, on January 18, 2006, Plaintiffs filed a NPR for the '129 patent. USAA argues that by filing the NPR, Plaintiffs established that the '129 patent disclosed a different invention than the '837 patent and its purported continuation, the '432 patent. See infra IV.B.4. Thus, USAA advises, the intermediate '129 patent had been disclaimed and the Plaintiffs could not file a petition (1) claiming priority through the '129 patent and (2) stating that any delay in claiming such priority was unintentional.

As the result of these documents, USAA argued at trial that the delay was not "unintentional" and that the only reasonable inference from the filing of the petitions is that Mr. Kim and Plaintiffs engaged in an intentional effort to mislead the PTO with regard to the priority claims of the '432 patent so as to permit the '432 patent to retain the benefit of the '837 filing date (now, through the '129 patent) and to thereby keep the '432 patent from being invalidated by the '837 patent as prior anticipatory art.

In addition, USAA advises that Mr. Kim did not fully understand Plaintiffs' filing strategy, Trial Tr. at 982:8–20, April 24, 2017 and so could not have "truthfully represented unintentional delay or that the priority claims are the product of uninten-

tional action." Id. In addition, USAA notes that Mr. Kim's investigation prior to filing the two petitions, if any, was minimal: prior to filing the first petition, Mr. Kim depended on his law partner's investigation into the accuracy of the statement regarding unintentional delay; prior to filing the second petition, he conducted an investigation that mainly consisted of attempting to acquire declarations from past prosecution counsel supporting the statement of unintentional delay. ECF No. 356, at 26–32.

Finally, USAA argued that Mr. Kim's filings were not the result of an attempt to correct a previous oversight but as "part of the litigation strategy to deal with USAA's [Covered Business Method Review Petitions in the PTO, which concerned the priority claims of the '432 patent]." Trial Tr. at 984:6–10; ECF No. 356, at 26.

Nonetheless, although it is certainly reasonable to infer specific intent to deceive the PTO, the Court declined to find specific intent to deceive or that the petition was unmistakably false for a number of reasons.

First, at the trial, Mr. Fortkort explained that when the examiner issued the double patenting rejection, he could have challenged the substantial similarity assessment but chose not to because (1) fighting the double patenting rejection on a substantive basis was rarely done as it would result in extensive filings—antithetical to clients who wanted the job done in as cost-efficient a manner as possible—and a cluttered file history; and (2) filing terminal disclaimers would far more easily obviate the double patenting rejection and make for a cleaner file history. Trial Tr. at 446:17–19; 447:10–13; 452:16–21, April 20, 2017. Second, Mr. Fortkort explained, simply because he had filed a power of attorney in both the '129 and '432 patents did not mean he examined both to determine

whether they contained the same claims or whether the '432 patent could have claimed priority through the '129 patent. Id. at 428:9. Thus, altogether, it was reasonable to believe that Mr. Fortkort would not have examined the '432 and '129 patent for a potential priority relationship between the two and therefore would not have been on notice of such a relationship. Accordingly, it is further reasonable to infer that neither of the Plaintiffs were aware of such a potential priority claim and, accordingly, that they did not inform Mr. Kim and that he was not aware of such a relationship.

As to Mr. Kim, Mr. Kim testified at trial he consulted, prior to filing the first petition, with his law partner, relying on his investigation. His partner also communicated with the inventors and "received a declaration from the patentees stating that the entire delay was unintentional." Trial Tr. at 119:8–14, April 18, 2017. In filing the first petition, Mr. Kim relied on this investigation and the statement. Id. Prior to filing the second petition, Mr. Kim contacted previous patent agents and attorneys for the Plaintiffs to ensure that a claim for priority through the '129 patent had not previously been discovered and to obtain declarations to that effect. Id. at 119:8–23. However, once Mr. Kim was informed by the PTO that declarations from previous patent agents and attorneys were not necessary, he filed the second petition. Id. at 157:17–18.

The Court found that it was reasonable to infer that Mr. Kim believed that the statements claiming unintentional delay were true at the time he signed it. As with the second allegation of inequitable conduct, the Court found that where Mr. Kim had conducted an investigation or relied on the investigation of his law partner and had at least some idea that the certification he was making was true, intent to deceive and an unmistakably false affidavit were not the single most reasonable infer-

ences. See also 3D Medical Imaging Systems, LLC, 228 F.Supp.3d at 1334–35, 1336–38, 2017 WL 106018, at *2, *4. Because Mr. Kim's consulted with his law firm partners and attempted to conduct his own investigation into the delay, even if the statement regarding unintentional delay was incorrect, Mr. Kim's signing could have been the result of a careless investigation or an honest mistake. See also Trial Tr. at 1014:8–9, April 24, 2017. As with Plaintiffs' explanation regarding the pro se petitions, the Court found that such an explanation to, on its face, be plausible. Thus, the Court found that USAA could not prove specific intent to deceive or that the filing was unmistakably false under the heightened standard required by Therasense.

### 4. Fourth Allegation: Improper Non–Publication Requests

Fourth, USAA contends that the PTO applications submitted with the '676 and '129 patents were false because each contained a NPR. A NPR requires that the patent holder certify that the "invention" has not and will not be the subject of an application in another country. However, as the parties agree, there was a counterpart international Patent Cooperation Treaty ("PCT") application submitted to the World Intellectual Property Office ("WIPO") with "substantially identical" specification and claims as the application that issued as the '837 patent. This counterpart international application was filed on August 29, 2001 and published on March 13, 2003. PX–6. See also ECF No. 356, at 32. Thus, USAA argued, the NPRs were unmistakably false affidavits that violated 37 C.F.R. § 11.18(b) (requiring that any signed representations to the USPTO are true). According to USAA, as the result of the filing of the NPR for the '676 and '129 patents, either (1) the '676 and '129 patents are different inventions than the '837 patent (and so the '432 pat-

ent cannot obtain the benefit of the '837 patent priority/filing date) or (2) the Plaintiffs lied in the NPR, Id. at 27. See also ECF No. 225, at 11. If it is the latter, the '676 and '129 patents are considered abandoned and the '432 patent cannot claim priority to the '837 patent. In addition, the '432 patent would be invalid because it is anticipated by the '837 patent. ECF No. 225, at 11. See also ECF No. 325, at 27. USAA further argued that the Plaintiffs and their attorneys and agents made efforts to conceal the improper NPRs and thus avoid the penalties associated with violating 37 C.F.R. § 11.18(b), as found in 37 C.F.R. § 11.18(c)(5) (termination of proceedings in the USPTO). USAA concluded that the '432 patent is rendered unenforceable by such inequitable conduct.

Furthermore, USAA argued, even if the NPRs were not but-for material, Therasense, 649 F.3d at 1292, still carves out an exception to the materiality requirement for false declarations. ECF No. 325, at 28. See also Intellect Wireless, Inc. v. HTC Corp., 732 F.3d 1339, 1344 (Fed. Cir. 2013) ("We note that Therasense in no way modified [the holding] that the materiality prong of inequitable conduct is met when an applicant files a false affidavit and fails to cure the misconduct.").

However, at trial, the Court declined to find that Plaintiffs and their agents acted with the specific intent to deceive the PTO on this matter. As established at trial, Plaintiffs filed the NPRs pro se, and testified to understanding that the meaning of "invention" was the specific application, rather than the subject matter as a whole.[7] Trial Tr. at 238:23-24; 240:2; 243:14, April 19, 2017. Such an understanding would therefore be consistent with the filing of the NPRs for the '676 and '129 patents

because the applications for the '676 and '129 patents themselves had not been the subject of a foreign filing. Furthermore, Plaintiffs testified at the trial that there is no established definition of "invention" for PTO purposes. Id. at 238:23-24. Given that both the Plaintiffs, their agents, and the attorneys in this trial argued for different meanings of the term "invention"—and, as the Court established in its denial of Plaintiffs' Motion to Dismiss, there is relatively little case law on this matter and varying interpretations of this term are reasonable, ECF No. 225, at 9–16—it is plausible that Plaintiffs believed that the NPR was concerned with whether exact same application, rather than the overall invention, was the subject of a foreign filing, particularly when the applications differed as to specification and claim sets. Thus, it is also plausible that they believed the certifications were true at the time they filed it. As a result, the Court declined to find that Plaintiffs acted with intent to deceive the PTO or filed unmistakably false affidavits.

Furthermore, as to materiality, USAA failed to establish that the filing of the NPRs was but-for material. Even MPEP § 1122 states that even if an improper nonpublication request is filed after a foreign or PCT application is filed first, "the [PTO] will not consider the U.S. application as abandoned for having made the nonpublication request."

Finally, it is also reasonable that Plaintiffs' attorneys and agents also believed the NPR was true because of the differing possible interpretations of "invention." Thus, a failure to rescind the request would not necessarily have been the result of an intent to deceive the PTO. The Court found that it was reasonable to infer that such a failure to rescind the request

---

7. Former Director Q. Todd Dickinson also noted that, even if the certifications were improper, Plaintiffs were pro se and filing "in a

complicated area of patent procedures" at the time they filed the request. ECF No. 306, Ex. 1 ¶ 174.

stemmed from a belief that the NPR was true because the specific '676 or '129 application—as the "invention" in the NPR—had not been the subject of the WIPO filing. Thus, where such an explanation was found to be reasonable, the Court declined to find intent to deceive.

Accordingly, because such explanations for the filing of the NPRs and the failure to rescind such NPRs were reasonable, the Court found that USAA had failed to demonstrate an intent to deceive by clear and convincing evidence. The Court further found that USAA had failed to demonstrate either the filing of an unmistakably false affidavit or but-for materiality by either a preponderance of the evidence or clear and convincing evidence. Thus, the Court declined to find inequitable conduct.

## V. CONCLUSION

Previously, this Court found USAA's allegations of inequitable conduct strong enough to survive motions to dismiss and for summary judgment. ECF Nos. 225, 358. Similarly, at trial, USAA presented more than sufficient evidence to make an inference of inequitable conduct extremely plausible. Nonetheless, the Court, mindful of Therasense's directive to apply a heightened standard to inequitable conduct allegations, declined to find that inequitable conduct—with its elements of intent to deceive and materiality/affirmatively egregious misconduct—was the single most reasonable inference.

For the reasons stated herein and on the record at the conclusion of the April 18–25, 2017 bench trial, the Court **FINDS** that USAA has failed to establish, by clear and convincing evidence, both the elements of intent to deceive and materiality, as required to prove inequitable conduct by the Plaintiffs, Dr. Tadayon, Mr. Fortkort, and Mr. Kim. As a result, the Court further **FINDS** that Plaintiffs' asserted patent is not unenforceable for inequitable

conduct. Accordingly, Plaintiffs' Motion for Judgment on Partial Findings is **GRANTED**. ECF No. 368.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED.**